IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

VICTOR TSUPKP d/b/a            )
VICTORY MOTORS INC.,          )
                              )
   Plaintiffs/Cross Defendants,[1]   )
                              )
   v.                         )       Civil Action No. 1:24-cv-360 (RDA/LRV)
                              )
WESTLAKE FLOORING CO., LLC, d/b/a )   Under Seal
WESTLAKE FLOORING SERVICES,    )
                              )
   Defendant/Cross Claimant.   )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on the parties' cross-motions for summary judgment ("Motions"). Dkt. 38, 40. This matter has been fully briefed and is now ripe for disposition. This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). Considering the Motions together with Plaintiffs' Memorandum in Support (Dkt. 39), Defendant's Memorandum in Support (Dkt. 44), Defendant's Opposition (Dkt. 48), Plaintiffs' Opposition (Dkt. 49), Plaintiffs' Reply (Dkt. 54), and Defendant's Reply (Dkt. 55), this Court GRANTS-IN-PART and DENIES-IN-PART Plaintiffs' Motion for Summary Judgment and GRANTS-IN-PART and DENIES-IN-PART Defendant's Motion for Summary Judgment for the reasons that follow.

---

[1] Because the Complaint here was filed *pro se* originally, it was filed by Victor Tsupko on behalf of Victory Motors. This was an inappropriate designation because a corporation cannot proceed *pro se*. Nonetheless, the Complaint makes clear that both Tsupko *and* Victory Motors are Plaintiffs. Dkt. 1 at 1 ("Victor Tsupko is the plaintiff in this case . . . . Victory Motors is *also* a Plaintiff . . . ."). The counterclaims are also asserted against both Tsupko and Victory Motors. Dkt. 10. In their summary judgment briefing, however, Plaintiffs refer to themselves as "Plaintiff" in the singular form. Dkts. 39, 49. Because this is not accurate, the Court refers to the Tsupko and Victory Motors collectively as "Plaintiffs." However, there may be points in this opinion at which the Court quotes from the materials and it refers to "Plaintiff" singularly.

## I.    PROCEDURAL BACKGROUND

Plaintiff Victor Tsupko d/b/a Victory Motors, Inc. filed a Complaint *pro se* through its owner on March 6, 2024.  Dkt. 1.  Victory Motors asserted that Defendant Westlake Flooring Company d/b/a Westlake Flooring Services ("Westlake"): (i) improperly repossessed vehicles; (ii) improperly accelerated contract payments; (iii) made unauthorized charges; (iv) breached the implied covenant of good faith and fair dealing; (v) made threats and engaged in harassment; and (vi) breached the contract.  *Id.*  On May 8, 2024, Westlake filed its Answer and Counterclaim. Dkt. 10.  Westlake asserts the following claims: (i) breach of contract against Victory Motors; (ii) breach of contract against Victor Tsupko ("Tsupko"); (iii) tortious interference with contract against Tsupko; and (iv) replevin against Victory Motors.  *Id.*

On May 9, 2024, the Court issued an Order advising Victory Motors that it could not appear *pro se*.  Dkt. 11.  The Court also issued a Scheduling Order.  Dkt. 12.  On May 21, 2024, Victory Motors filed a motion seeking an extension of the deadline to obtain counsel.  Dkt. 13.  That motion was granted.  Dkt. 15.  On May 29, 2024, Victory Motors and Tsupko, now represented by counsel, filed a Verified Answer to the Counterclaim.  Dkt. 18.  That same day U.S. Magistrate Judge Lindsey R. Vaala held the initial pretrial conference and issued the Rule 16(b) Scheduling Order. Dkts. 19, 20.  On September 13, 2024, the parties filed a motion to amend the scheduling order that was subsequently granted by Judge Vaala.  Dkts. 24, 25.

On November 8, 2024, Plaintiffs filed their Motion for Summary Judgment.  Dkt. 38.  On that same day, Westlake filed its Motion for Summary Judgment.  Dkt. 40.  On November 22, 2024, the parties filed their Oppositions.  Dkts. 48, 49.  On December 6, 2024, the parties filed their Replies.  Dkts. 54, 55.

## II.    UNDISPUTED STATEMENT OF FACTS

Before analyzing the Motions at issue here, the Court must first determine the undisputed summary judgment record, as summary judgment is only appropriate where there are no genuine disputes of material fact. The fact that the parties filed cross-motions for summary judgment does not generally relieve the Court of its obligation to determine whether there are disputes as to material facts which prevent the entry of judgment as a matter of law. *Webster v. ACB Receivables Mgmt., Inc.*, 15 F. Supp. 3d 619, 625 (D. Md. 2014). Here, in compliance with the Rules of Civil Procedure and the Local Rules, the parties have both set forth their respective statements of undisputed facts in enumerated paragraphs. In their Opposition briefs, the parties have set forth any alleged disputes that they have with respect to the asserted facts. Additionally, Westlake sets forth its so-called "Additional Undisputed Facts." Dkt. 48 at 5. Such additional facts are not generally contemplated by the Rules; nonetheless the Court will consider them here. *See Amazon.com, Inc. v. WDC Holdings, Inc.*, 2023 WL 2815140, at *2 n.6 (E.D. Va. Apr. 6, 2023). The Court has reviewed all of the parties' submissions and determined that the following facts are undisputed:

1. Tsupko is a resident of Virginia.

2. Victory Motors is a Virginia Corporation.

3. Tsupko is the sole owner, sole director, and duly authorized agent of Victory Motors.[2]

---

[2] Westlake asserts that it "is not aware of any additional owners or directors of Victory Motors besides Tsupko, but Plaintiffs' factual statement in Paragraph 3 of their Statement of Undisputed Material Facts does not include any citations to evidence in the record. It only includes a citation to the Complaint." Dkt. 48 at 4. Westlake is correct that the Complaint, although marked as "Verified," is not properly sworn under penalty of perjury. Dkt. 1. On the other hand, in support of the Complaint, Tsupko attached an affidavit which is properly sworn and notarized, which states: "I am the Sole Director and owner of Victory Motors Inc., a corporation duly organized and existing under the laws of the State of Virginia, with its principal place of business at 9125 Antique Way, Manasses, VA 20110." Dkt. 1-4. Tsupko's Declaration attached to Plaintiffs' Opposition

3

4. Westlake Flooring Company, LLC d/b/a Westlake Flooring Services is a California limited liability company.

5. Westlake Flooring Company d/b/a Westlake Flooring Services is wholly owned by Westlake Services LLC d/b/a Westlake Financial Services, which is wholly owned by Nowlake Technology, LLC, the majority of which is owned by Westlake Holding Company, and a minority (but more than 10 percent) of Nowlake is owned by Marubeni Corporation.

6. In the *pro se* Complaint, the Plaintiffs did not affirmatively allege the citizenship of each of Westlake's members.

7. In its Financial Disclosure Statement, Westlake asserted that Westlake Services, LLC d/b/a Westlake Financial Services ("Westlake Financial") is a California limited liability company. Westlake further asserted that Westlake Financial is wholly owned by Nowlake Technology, LLC ("Nowlake"), a California limited liability company. Nowlake is owned by Westlake Services Holding Company, a privately held California corporation, and Marubeni Corporation, a publicly held corporation. Dkt. 7.[3]

8. Nowlake is a limited liability company with 101 members.

9. Of the 101 members, 92 members are natural persons. The natural persons who are members of Nowlake are citizens of California, Florida, Texas, and Washington.

10. The remaining nine members have the following citizenships:

   a. The DH 2012 Grantor Trust fbo Bret Putnam Hankey is an unincorporated artificial entity, and each member of the trust and the trustee is a citizen of California.

   b. The DH 2012 Grantor Trust fbo Deborah L. Bowles is an unincorporated artificial entity, and each member of the trust and the trustee is a citizen of California.

   c. The DH 2012 Grantor Trust fbo Patricia Hankey is an unincorporated artificial entity, and each member of the trust and the trustee is a citizen of California.

---

similarly states that he is the sole owner of Victory Motors. Dkt. 49-1. This is sufficient to support the asserted fact. Accordingly, there is no genuine dispute as to the asserted fact.

[3] Plaintiff's asserted undisputed fact is that "Westlake has not affirmatively alleged the citizenship of its members." Dkt. 39 at 3 ¶ 7. This is incorrect, as Westlake alleged the citizenship of its members in the Financial Disclosure Statement and has further done so in the summary judgment briefing.

d. The Don Hankey Trust is an unincorporated artificial entity, and each member of the trust and the trustee is a citizen of California.

e. Hankey RE is a segregated portfolio of Knight Insurance Company, SLC ("Knight"). Knight is an exempted company incorporated and registered as a segregated portfolio company in the Cayman Islands. Knight is wholly owned by Knight Insurance Company, LTD, a private limited company incorporated and registered in the Cayman Islands, with its principal place of business in California.

f. MAI Holdings, LLC is a limited liability company organized under the laws of Delaware. The members of MAI Holdings, LLC are Marubeni America Corporation and Marubeni Auto Investment (USA) Holding. Marubeni America Corporation is a corporation organized under New York law, with a principal place of business in New York. Marubeni Auto Investment (USA) Inc. is a Delaware corporation, with its principal place of business in California. Both Marubeni America Corporation and Marubeni Auto Investment (USA) Holding are wholly owned by Marubeni Corporation, which is a Japanese corporation.

g. Nowcom Holding Company, Inc. is a corporation organized under the laws of California with its principal place of business in California.

h. The Rufus Hanke Children's Trust is an unincorporated artificial entity, and each member of the trust and the trustee is a citizen of California.

i. Westlake Services Holding Company is a corporation organized under the laws of California, with its principal place of business in California.

11. None of the members of Nowlake are citizens of Virginia.

12. Victory Motors and Westlake had a business relationship with each other for approximately ten years.

13. On August 15, 2014, Victory Motors entered into a Loan and Security Agreement with Westlake.

14. On October 26, 2018, Victory Motors entered into an amended Promissory Note and Loan and Security Agreement ("PNLSA") with Westlake.[4]

---

[4] Plaintiffs attempt to dispute the asserted fact only to the extent that Westlake asserts that the PNLSA is an "amended document because it is not labeled as such." Dkt. 49 at 1 ¶ 2. The PNLSA itself, however, states: "This Note and the other Loan Documents are intended by the Parties to be an amendment to and restatement of any prior Promissory Note and Loan Security Agreement or similar document or instrument (including any prior promissory note, loan and security agreement or similar contract)." Dkt. 1-3 at 14 ¶ 12. Thus, Plaintiffs have not properly disputed the asserted fact, and there is no genuine dispute.

15. The validity, enforceability, and interpretation of the PNLSA is governed by California law.

16. Under the PNLSA, Westlake agreed to provide Victory Motors with funds, at Westlake's discretion, which Victory Motors could use to purchase vehicles that it would subsequently sell to customers through its dealership.

17. In return, Victory Motors agreed to make payments to Westlake in connection with Victory Motors' sale of vehicles that it purchased using funds from Westlake.[5]

18. To secure Westlake's loans, Victory Motors granted Westlake a security interest in all of Victory Motors' assets and properties.

19. Victory Motors also made certain representations in the PNLSA regarding its use of the loan proceeds and the location of the vehicles. Victory Motors agreed to the following:

  a. Use of Proceeds: Restrictions. To exclusively use Floorplan Advance proceeds to purchase Lender Financial Inventory from auctions or third party businesses who have entered into a Third Party Funding Agreement with Lender, consistent with Borrower's Ordinary Course of Business and in accordance with Law. Such Lender Financial Inventory shall . . . be solely used for retail sale and not for lease . . . and not to sell or otherwise dispose of any Lender Financed Inventory except as herein provided.

  b. Location: Consignment. To keep Lender Financed Inventory only at Borrower's Place of Business and not to remove any Lender Financed Inventory from such place, unless authorized in writing by Lender.

  c. Westlake Portal. That Borrower may have an account with Lender where information can be accessed and transmissions can be sent through the Westlake Portal or by other electronic means. . . . Access to Borrower's account may be revoked or otherwise restricted by Lender at any time, in Lender's sole discretion, without prior notice to Borrower.

20. The PNLSA listed numerous actions on Victory Motors' part that would constitute an event of default, including the following:

  a. Borrower or any Guarantor fails to perform any of its obligations, undertakings, or covenants under this Note or under any other Loan Document, including any obligation to repay any Liability when due and

---

[5] Plaintiffs attempt to dispute this asserted fact "to the extent it does not include the additional terms of the PNLSA, both written and implied, that governs the parties' relationship." Dkt. 49 at 2. Because Plaintiffs do not dispute the contents of the asserted fact, but rather suggest that the asserted fact is incomplete, Plaintiffs have not properly disputed the asserted fact.

Borrower's obligation to pay upon demand any outstanding Liability under this Note.

   b. Borrower or any Guarantor breaches or otherwise violates any provision of this Note or any other Loan Document.

   c. Lender in its sole and absolute discretion deems itself insecure for any reason.

21. The PNLSA further provides that, if one of the events of default occurs, Westlake may demand immediate payment of the entire balance remaining under the PNLSA and may take possession of vehicles Victory Motors possess:

RIGHTS AND REMEDIES. Upon any Event of Default, Lender may, at its option and without notice to Borrower, exercise any or all of the following rights in a separate, successive, or concurrent fashion, and Lender's exercise of any rights hereunder shall not preclude Lender from pursuing other rights and remedies in conjunction therewith or at a later time:

   a. <u>Acceleration</u>. Demand immediate payment of all Liabilities under this Note and the other Loan Documents and all other indebtedness and amounts owed to Lender and its Affiliates by Borrower and its Affiliates. Lender shall have all rights and remedies available hereunder and under the other Loan Documents, and all rights and remedies available to Lender at law or equity, including the rights and remedies of a secured party under the UCC. These rights and remedies include the right to cancel any unfunded Advances; to enter into Borrower's premises with or without legal process, but without force, and to take possession of and remove any Collateral; and to notify any account debtors or other Person obligated on Collateral to make payment or otherwise render performance to or for the benefit of Lender.

   b. <u>Foreclosure</u>. Without limiting the foregoing, Lender may take control of any funds generated by any Collateral, and in Lender's name or Borrower's name, demand, collect, receipt for, settle, compromise, sue for, repossess, accept surrender of, foreclose, or realize upon any Collateral. Borrower waives any and all rights it may have to notice prior to seizure by Lender of any Collateral.

22. The PNLSA also allows Westlake to recover its collection costs and attorneys' fees in enforcing its rights or defending against an unsuccessful claim by Victory Motors.

23. On October 26, 2018, Tsupko executed an individual and personal guaranty of Victory Motors' obligations to Westlake under the PNLSA (the "Guaranty").

24. The validity, enforceability, and interpretation of the Guaranty is governed by California law.

7

25. Tsupko guaranteed that all Liabilities under the PNLSA would be paid promptly and in full when due. Tsupko also guaranteed the full and prompt performance of all the terms, covenants, conditions, and agreements related to the Liabilities.

26. Tsupko also granted Westlake a security interest in all of *his* assets and personal properties.

27. Under the Guaranty, there were multiple events that would constitute an event of default on Tsupko's part, including the following:

    a. Guarantor fails to make full payment of any amount owed hereunder after notice from Lender.

    b. Guarantor fails to perform or observe any agreement, covenant, term, or condition contained in this Guaranty (other than any monetary obligation described . . . above), and such failure continues for ten (10) days after notice from Lender.

    c. There is any Event of Default by Guarantor under the Note and Guaranty.

28. The Guaranty also provides that, if an event of default occurs, Westlake may demand immediate payment of the entire balance remaining under the PNLSA, among other options.

29. The Guaranty further provides that Westlake may recover any attorneys' fees and court costs it incurs in enforcing its rights under the Guaranty or in defending against a claim related to the PNLSA.

30. Tsupko estimates that Victory Motors has sold over 1000 cars that it purchased using Westlake's line of credit.

31. When Victory Motors purchased a vehicle from an auction-house using its Westlake line of credit, the auction-house would send the physical title for the vehicle to Westlake.[6]

---

[6] Plaintiffs attempt to dispute the asserted fact by arguing: "Plaintiff and Defendant have a history of course of dealing whereby they agreed that purchases that were for vehicles that an auction house did not have the title for [sic], resulting in delays for title transfer not caused by Plaintiff, warranting the dispute of this statement because it falsely asserts title is transferred to Westlake right when a vehicle was purchased from an auction." Dkt. 49 at 6 ¶ 19. The Court does not read Westlake's asserted fact as implicating the speed with which title was transferred. In any event, the portions of Tsupko's declaration upon which Plaintiffs' rely supports Westlake's asserted fact. Dkt. 49-1 at 3 ¶ 14 ("Westlake served primarily as the title custodian for Victory Motors, retaining the original titles for purchased vehicles as a convenience to facilitate orderly title management."); Dkt. 44-6, Tsupko Dep. Tr. at 92:11-14 ("Q: But Westlake would hold physical possession of the title for vehicles that were purchased using its line of credit; correct? A: Well, yeah."). Accordingly, there is no genuine dispute of fact here.

32. When Victory Motors sold a vehicle that it purchased through Westlake's line of credit, Westlake would release the physical title to Victory Motors for delivery to the customer who purchased the vehicle.[7]

33. Between July 4, 2023, and February 13, 2024, Victory Motors purchased the twenty-four vehicles at issue in this action for which it failed to pay Westlake and that Westlake has been unable to repossess (the "Subject Vehicles").[8] When it purchased the Subject Vehicles, Westlake received the physical certificates of title, which are still in Westlake's possession.[9]

34. In August 2023, Victory Motors began having issues with NextGear. Victory Motors considered NextGear its central line of credit, as NextGear provided a $1.7 million credit line.

35. According to Tsupko, in October 2023, NextGear put a hold on Victory Motors' line of credit.

36. According to Tsupko, in December 2023, Kinetic also put a hold on Victory Motors' line of credit.

---

[7] Plaintiffs successfully disputed a portion of Westlake's asserted fact. Westlake asserted that, when Victory Motors sold a vehicle, Westlake would only release the title upon receipt of funds. Dkt. 44 at 8 ¶ 20. Plaintiffs successfully disputed this portion of Westlake's asserted fact because, in Tsupko's deposition, he testified that the title would be released when the vehicle was sold, but not necessarily when the funds were transferred to Westlake. Dkt. 49-2, Tsupko Dep. Tr. at 92:20-94:11 (in response to questions regarding whether he would have to pay Westlake before it would release the title, Tsupko testified: "Not momentarily. There are a few options, basically. When you sell the unit, you go the portal and click . . . the button to get the title. That's when the title is getting send [sic] over by the system automatically when its paid off, or it's getting send [sic] out, if there's no glitch, of course. . . . There is a button in the portal that says release the title. So, when dealership needs a title, they can get it. . . . There's an option to get a title through the portal without informing Westlake of a sale."). Accordingly, Plaintiffs have successfully disputed the asserted fact, but the Court finds it immaterial.

[8] The twenty-four Subject Vehicles are listed in Westlake's statement of undisputed facts and are not listed out again here. Dkt. 44 at 9 (table).

[9] Plaintiffs attempt to dispute the asserted fact but have failed to do so because the basis for the dispute is unclear. Indeed, Plaintiffs merely state: "Plaintiff disputes this statement for the same reasons that Plaintiff disputes statement 19 above." Dkt. 49 at 7. But it is unclear how Plaintiffs' prior argument applies here. Indeed, the citations to the record contained within Plaintiffs' prior dispute do not address the Subject Vehicles. Thus, it is unclear how such testimony could refute Westlake's asserted fact, which is supported by references to the record. Accordingly, Plaintiffs have failed to adequately dispute Westlake's asserted fact, and there is no genuine dispute of material fact.

37. Westlake was not involved in any decision NextGear or Kinetic made with respect to Victory Motors' line of credit, although those companies did share some information. Westlake, NextGear, and Kinetic are separate companies and are, in fact, competitors.[10, 11]

38. Between January 20 and February 19, 2024, Victory Motors sold the Subject Vehicles. Thus, Victory Motors is not currently in possession of any of the vehicles identified by Westlake in paragraph 4 of its Counterclaim.[12, 13]

---

[10] Plaintiffs attempt to dispute the asserted fact that Westlake was not involved in decisions by NextGear or Kinetic. In this regard, Plaintiffs merely argue: "Plaintiff disputes this statement because at the same time NextGear and Kinetic put a hold on Victory Motor's lines of credit, Westlake declared Victory Motors to be in default." Dkt. 49 at 8 ¶ 25. Plaintiffs' argument in this regard is simply that these three companies made similar decisions at the same time, and does not contradict that Westlake was not involved in the decision-making process. Moreover, the testimony cited by Plaintiffs does not support that Plaintiffs have any evidence that Westlake was involved in the decision-making process at NextGear and/or Kinetic, but does support that the companies were sharing some financial information. Dkt. 49-2, Tsupko Dep. Tr. at 37:17-38:18 (Tsupko testifying that he knew that the companies were sharing financial information but that he had "no idea" what kind and that he "can assume"); see also Dkt. 49 at 8 ¶ 25 (citing deposition testimony). Thus, Tsupko's deposition testimony establishes that the companies were sharing some financial information but does not establish that Westlake was involved in the decision-making at NextGear or Kinetic. Rather, Tsupko assumes such facts but points to no record evidence to support his speculation. Tsupko's speculation is not sufficient to contradict the affirmative statements made by Jonathan Zhan based on his personal knowledge. Dkt. 44-1 at 17 ¶ 41. Accordingly, the Court has modified the asserted fact to reflect that the companies shared some information, but there is no genuine dispute of fact as to Westlake's involvement in the decisions of other companies.

[11] In its second asserted fact, Westlake make assertions regarding whether there is support in the record for Plaintiffs' allegations regarding NextGear and Kinetic. Dkt. 44 at 14 ¶ 42. This is argument and not properly asserted as a statement of fact. The only portion of the asserted fact that the Court includes here is the additional fact that Westlake, NextGear, and Kinetic are competitors, which Westlake properly asserted and which Plaintiffs have not properly disputed.

[12] Westlake asserts that it cannot dispute the asserted fact because "Victory Motors concealed the sales at issue from Westlake." Dkt. 48 at 4 ¶ 9.

[13] Citing Tsupko's deposition testimony, Plaintiffs assert: "There are no Vehicles identified by Westlake in Paragraph 4 of its Counterclaim that were ever hidden from Westlake." Dkt. 39 at 3 ¶ 10 (citing Dkt. 39-1, Tsupko Depo. Tr. at 95:4-21). The cited deposition testimony, however, does not support the asserted fact that nothing was hidden from Westlake as the basic thrust of the testimony is that "all of the vehicles other than those that Westlake was able to repossess were sold." Dkt. 39-1, Tsupko Depo. Tr. at 95:4-21. The testimony says nothing about whether the sale of any vehicles was hidden or not. Accordingly, the asserted fact is not supported by citation to the record as required by Rule 56 and will not be included as an undisputed fact.

39. In connection with these sales, Tsupko orchestrated a scheme to obtain duplicate titles from the Virginia Department of Motor Vehicles ("DMV"), thereby allowing Victory Motors to sell vehicles for which Westlake held the titles. This is apparent from the following facts, which are undisputed:

    a. Tsupko is the sole owner and officer of Victory Motors.

    b. Tsupko managed the day-to-day operations of Victory Motors.

    c. Tsupko had detailed knowledge of the process by which Westlake would release the title for a vehicle.

    d. Tsupko alone managed the finances of Victory Motors.

    e. Tsupko was the only person who could remove funds from the safe deposit box where funds were kept after a vehicle was sold.

    f. Tsupko ordinarily worked with Westlake to provide proceeds to the Westlake portal to obtain titles after a vehicle was sold.

    g. The Subject Vehicles were sold while Westlake held the respective certificates of title.

    h. The Subject Vehicles were sold before the duplicate titles were issued.[14]

---

The remaining two purported facts asserted by Plaintiffs in their Memorandum in Support (Dkt. 39 at 3 ¶¶ 11-12) are not properly asserted as facts but are instead legal arguments regarding the scope of Westlake's alleged damages and allegations. Westlake disputes both of the asserted facts. Dkt. 48 at 5 ¶¶ 11, 12. Accordingly, those assertions will not be recited as facts here.

[14] Interestingly, Plaintiffs do not dispute the "Tsupko orchestrated" portion of the asserted fact, rather they dispute only "the last bullet point for the reasons [that] Plaintiff disputes statement 19 above." Dkt. 49 at 9 ¶ 27. It is completely unclear how the previously asserted basis applies here. *Id.* at 6 ¶ 19 (for statement 19, Plaintiffs asserted: "Plaintiff disputes this statement because Plaintiff and Defendant have a history of course of dealing whereby they agreed that purchases that were for vehicles that an auction house did not have the title for, resulting in delays for title transfer not caused by Plaintiff, warranting the dispute of this fact because it falsely asserts title is transferred to Westlake right when a vehicle was purchased from an auction."). Accordingly, Plaintiffs have failed to adequately dispute the asserted fact here, and there is no genuine dispute of fact.

40. With the duplicate title in Victory Motors' name in hand, Tsupko, Victory Motors, or its employees had each customer complete an Application for Certificate of Title and Registration.[15]

41. These applications were then submitted to the Virginia DMV, which resulted in titles being issued listing the customers as the new owners of their respective vehicles.

42. The ultimate outcome of this process was the Virginia DMV issued new certificates of title for the Subject Vehicles to Victory Motors' customers – while Westlake still had certificates of title for the same vehicles in its possession.[16]

43. On February 14, 2024, at the same time Tsupko was facilitating the procurement of these new titles, Victory Motors made what would become its last payment to Westlake.[17]

---

[15] Here again, Plaintiffs assert that they dispute the asserted fact "for the same reasons Plaintiff disputes statement 19 above." Dkt. 49 at 9 ¶ 28. It is completely unclear how the previously asserted basis for dispute applies here. *Id.* at 6 ¶ 19 (for statement 19, Plaintiffs asserted: "Plaintiff disputes this statement because Plaintiff and Defendant have a history of course of dealing whereby they agreed that purchases that were for vehicles that an auction house did not have the title for, resulting in delays for title transfer not caused by Plaintiff, warranting the dispute of this fact because it falsely asserts title is transferred to Westlake right when a vehicle was purchased from an auction."). Accordingly, Plaintiffs have failed to adequately dispute the asserted fact here, and there is no genuine dispute of fact.

[16] Here again, Plaintiffs assert that they dispute the asserted fact "for the same reasons Plaintiff disputes statement 19 above." Dkt. 49 at 9 ¶ 30. It is completely unclear how the previously asserted basis applies here. *Id.* at 6 ¶ 19 (for statement 19, Plaintiffs asserted: "Plaintiff disputes this statement because Plaintiff and Defendant have a history of course of dealing whereby they agreed that purchases that were for vehicles that an auction house did not have the title for, resulting in delays for title transfer not caused by Plaintiff, warranting the dispute of this fact because it falsely asserts title is transferred to Westlake right when a vehicle was purchased from an auction."). Accordingly, Plaintiffs have failed to adequately dispute the asserted fact here, and there is no genuine dispute of fact.

[17] Plaintiffs attempt to dispute the asserted fact on two bases: (i) they dispute that there was fraud; and (ii) they dispute it "for the reasons Plaintiff disputes statement 19 above." Dkt. 49 at 10 ¶ 31. The asserted fact originally stated: "On February 14, 2024 – at the same time Tsupko was facilitating fraudulent vehicle titles . . ." Dkt. 44 at 12 ¶ 31. With respect to the first argument, Plaintiffs are correct that, whether the transactions described above constitute fraud, is a legal determination for the Court and not properly asserted as an undisputed statement of fact. Accordingly, the Court has modified the asserted fact to remove the reference to fraud. With respect to the second argument, it is completely unclear how the previously asserted basis applies here. *Id.* at 6 ¶ 19 (summarized *supra*). Accordingly, Plaintiffs have failed to adequately dispute any other portion of the asserted fact, and there is no genuine dispute of fact.

44. On February 20, 2024, Joyce Porterfield, a Westlake area manager responsible for Victory Motors, sent an email to Tsupko reminding him that Victory Motors was reaching the end of the term (namely, the last date on which a dealer can pay off a vehicle before the loan is considered past due) for three vehicles. By February 21, 2024, Victory Motors failed to make any payments towards these vehicles or request an extension, causing Victory Motors to become delinquent.[18]

45. According to Tsupko, at this time, Tsupko "decided to take a break, reorganize [Victory Motors'] finances, and search for potential lenders or investors for [its] business."

46. On February 21, 2024, Victory Motors sent an email to Porterfield stating that "Victory Motors dealership is going to be closed for the week because [Tsupko] had to leave due to an emergency reason." Victory Motors never reopened.

47. This February 21 email raised alarms for Westlake. Victory Motors had bought hundreds of thousands of dollars' worth of vehicles with Westlake's funds, but it was now delinquent and supposedly "closed for the week" without providing further information to Westlake. As a result, Porterfield arranged for a Westlake contact to look at Victory Motors' lot and report back.

48. In response, on February 21, 2024, Sonny from House of Kars (a dealership next door to Victory Motors) reported to Westlake that some or all of the Subject Vehicles had been moved from Victory Motors' lot. In his deposition, Tsupko confirmed that the Subject Vehicles had been sold and removed from the lot.[19]

49. Westlake then began searching for any information on the Subject Vehicles and discovered that new titles had been issued. Tsupko later admitted to Westlake that he requested the duplicate titles from the Virginia DMV.

---

[18] Plaintiffs again attempt to dispute the asserted fact on two bases: (i) they dispute that there was fraud; and (ii) they dispute it "for the reasons Plaintiff disputes statement 19 above." Dkt. 49 at 10 ¶ 32. In the asserted fact, however, Westlake does not accuse Plaintiffs of fraud, so it is unclear how that argument applies here. Further, it is unclear how the previously asserted basis with respect to statement 19 applies here. *Id.* at 6 ¶ 19 (summarized *supra*). Accordingly, Plaintiffs have failed to adequately dispute any portion of the asserted fact, and there is no genuine dispute of fact.

[19] Plaintiffs do not dispute the facts asserted by Westlake; rather, Plaintiffs dispute the implication "of wrongdoing on behalf of Plaintiff." Dkt. 49 at 11 ¶ 36. This is not proper. As judges in this District have noted, "[f]acts are either admitted or not; to the extent they 'imply' any particular conclusion is argument, and the Court will treat such responses by Plaintiffs accordingly." *Crawford v. Newport News Indus. Corp.*, 2018 WL 4561671, at *5 n.5 (E.D. Va. Mar. 2, 2018). Accordingly, Plaintiffs have not properly disputed the asserted fact, and there is no genuine dispute of fact.

50. After learning that Victory Motors had obtained new titles and removed the Subject Vehicles from its lot, Westlake began taking action to limit its losses. Westlake repossessed the few vehicles it could from Victory Motors' lot, restricted Victory Motors' access to the online Westlake portal, and requested a transfer from one of the Victory Motors' bank accounts that Westlake had on file.

51. On February 26, 2024, Westlake informed Victory Motors and Tsupko that the bank account transfer had failed.

52. The total amount that Victory Motors owed Westlake as of February 26, 2024, was in the hundreds of thousands of dollars.[20]

53. On February 27, 2024, Westlake provided an additional notice to Victory Motors and Tsupko informing them that Victory Motors was in default under the PNLSA. As of the date of the Motion, Westlake maintains that Victory Motors owes Westlake $503,399.15, which is comprised of the outstanding balance for the loan funds plus the deficiency on the vehicles that Westlake was able to recover.[21]

54. Plaintiffs calculated their damages against Westlake based on their contention that Victory Motors had annual revenue of $10 million a year and looking over a period of three years that would be $30 million with Westlake owing a purported 17.5% share based on the line of credit it gave Victory Motors. Plaintiffs note, however, that the Complaint sought only $5,250,000.

55. Tsupko admits that this calculation was not based on any specific actions by Westlake.[22]

---

[20] Westlake asserted that the total amount owed is $540,258.07. Dkt. 44 at 14 ¶ 40. Plaintiff disputes the total amount owed by asserting that Westlake has not credited certain payments and reserve amounts. Dkt. 49 at 12 ¶ 40. Because the materials submitted by Westlake do not address whether such amounts should have been credited or were credited, Plaintiffs have successfully disputed the amount asserted by Westlake. Plaintiffs do not, however, dispute that Victory Motors owed Westlake a significant amount of money, and a review of the materials submitted by both Plaintiffs and Westlake reveals that, whatever the exact number might be, Victory Motors owed Westlake hundreds of thousands of dollars. Accordingly, the Court has modified the asserted fact, and there is no genuine dispute as to that fact.

[21] Plaintiffs again dispute the amount owed. Dkt. 49 at 12 ¶ 41. Accordingly, the Court has modified the asserted statement to reflect that it is what Westlake maintains is owed such that there can be no genuine dispute of fact.

[22] Plaintiffs do not dispute the asserted fact but argue that it is misleading. Dkt. 49 at 13 ¶ 44. Whether a fact is misleading is argument and does not properly dispute the asserted fact. The Court has, however, modified the prior asserted fact to reflect that the Complaint sought only $5,250,000 in damages. Accordingly, there is no genuine dispute of fact.

56. Victory Motors only surpassed an annual revenue of $10 million in 2023. Victory Motors had just over $9 million in revenue in 2022 and just under $10 million in 2021. Further, Victory Motors has not had a positive ordinary business income since 2021.[23]

57. Since January 2024, Tsupko has transferred more than $100,000.00 to his personal checking accounts or to accounts held by his other business High Project Group, Inc., a Florida corporation of which he is the president and sole officer. In addition, Tsupko has used Victory Motors' bank accounts to make purchases from vendors unrelated to Victory Motors' business such as restaurants, grocery stores, clothing stores, and other such stores.[24]

### III. LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. "(A) party opposing summary judgment may not simply rest on the allegations of his complaint but must instead come forward with specific evidence showing the existence of a genuine issue of fact."

---

[23] Plaintiffs attempt to dispute the asserted facts by asserting, without citation to any case, authority, or evidence, that "tax returns to [sic] not reflect the profitability of Victory Motors." Dkt. 49 at 13 ¶ 45. The referenced tax returns reflect Victory Motors' "gross receipts or sales," thus it is unclear why such returns are not appropriate record support for Westlake's assertion that Victory Motors had revenue of $10 million only in 2023. Dkt. 43-2. Plaintiffs cite no other record evidence establishing different revenue figures. Accordingly, there is no genuine dispute as to the asserted fact.

[24] Plaintiffs do not dispute the facts asserted by Westlake; rather, Plaintiffs dispute the implication "that the transfers were done in bad faith or to facilitate fraud." Dkt. 49 at 13 ¶ 46. This is not proper. Again it is worth emphasizing that "[f]acts are either admitted or not; to the extent they 'imply' any particular conclusion is argument, and the Court will treat such responses by Plaintiffs accordingly." *Crawford*, 2018 WL 4561671, at *5 n.5. Accordingly, Plaintiffs have not properly disputed the asserted fact, and there is no genuine dispute of fact.

*Muhammad v. Giant Food*, 108 F. App'x 757, 764 (4th Cir. 2004) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

The standard of review does not change when ruling on cross-motions for summary judgment. *E.I. DuPont De Nemours & Co. v. Ampthill Rayon Workers, Inc.*, 516 F. Supp. 2d 588, 593 (E.D. Va. 2007). When faced with cross-motions for summary judgment, a court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quotations omitted).

## IV.    ANALYSIS

Both parties have filed motions for summary judgment. Plaintiffs' Motion is somewhat unusual in that Plaintiffs – who filed this action in federal court on the basis of diversity jurisdiction – now claim that this Court lacks subject matter jurisdiction. Plaintiffs otherwise seek summary judgment in their favor on Westlake's tortious interference and replevin claims. Dkt. 39 at 4-7. For its part, Westlake seeks summary judgment in its favor on both Plaintiffs' claims against Westlake and Westlake's claims against Plaintiffs. Dkt. 44 at 17. Because Plaintiffs have questioned this Court's jurisdiction, the Court will first address whether diversity jurisdiction exists and then address each of the relevant claims.

### A.    There is Diversity Jurisdiction

Plaintiffs asserted that diversity jurisdiction existed in their Complaint. Dkt. 1 at 1-2 (asserting that Plaintiffs are citizens of Virginia and that Westlake is a citizen of California and that "no Westlake Flooring Company LLC member is a resident or citizen of Virginia"). Plaintiffs also claimed damages of $5,250,000. *Id.* at 8. Westlake did not challenge that there was diversity jurisdiction. Despite being represented by counsel since May 2024, Plaintiffs waited until

16

discovery had been completed and summary judgment motions were filed to challenge their own allegations of diversity jurisdiction. Essentially Plaintiffs assert that, notwithstanding the fact that they do not challenge the fact that diversity jurisdiction actually exists, because Plaintiffs failed to adequately affirmatively allege diversity jurisdiction as an initial matter, this Court must dismiss this action for lack of subject matter jurisdiction. Not so. Westlake – as the current proponent of subject-matter jurisdiction – has adequately and affirmatively established that the parties are (and always have been) completely diverse from one another; such that the requirements of diversity jurisdiction are satisfied.

Section 1332 of Title 28 of the United States Code provides that "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between . . . citizens of different states." Here, the amount-in-controversy requirement is easily met, both on the face of the Complaint and based on the asserted facts as summary judgment. Rather, Plaintiffs challenge their own allegations of diversity. As courts uniformly recognize, to satisfy the "citizens of different states" requirement, there must be "complete" diversity, that is "no plaintiff may share a citizenship with any defendant." *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 352 (4th Cir. 2020). Thus, "[b]ecause of this 'complete diversity' rule, a federal court must determine and compare the citizenship(s) of all plaintiffs and all defendants before exercising diversity jurisdiction under § 1332(a)." *Id.* With respect to corporations, "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1).

To begin with, at summary judgment, the Court is not limited to the allegations of jurisdiction alleged in the Complaint. Indeed, even when deciding a motion to dismiss, the Court

17

is not limited to the allegations in the Complaint. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982) (discussing how a court considering a motion to dismiss pursuant to Rule 12(b)(1) may consider "evidence by affidavit, depositions, or live testimony"). Although Plaintiffs would ordinarily be the proponent of federal jurisdiction, Plaintiffs have chosen, at this late date, to disavow their own allegations. Westlake, however, has also maintained that there is diversity jurisdiction and has set forth the necessary record evidence to establish that complete diversity exists. Dkt. 48 at 5-6 ¶¶ 13-18 (citing Dkt. 48-1). The Declaration of Marissa Minor sets forth the citizenship of each of the members of Westlake and its related entities and establishes that none are citizens of Virginia. Dkt. 48-1. As Plaintiffs set forth in their statement of undisputed facts and as Tsupko set forth in his Affidavit in support of the Complaint, Tsupko and Virginia Motors are both citizens of Virginia. Dkt. 39 at 2 ¶¶ 1-2; Dkt. 1-4. Thus, there is, and has always been, complete diversity. Accordingly, this Court may properly exercise jurisdiction here and declines to dismiss this matter, where diversity jurisdiction undisputably exists, on the basis that Plaintiffs did not affirmatively allege the citizenship of each of Westlake's members (and waited until summary judgment to raise the issue).[25]

          B.    Westlake's Tortious Interference with Contract Counterclaim

Both parties claim that they are entitled to summary judgment on Westlake's Tortious Interference with Contract Counterclaim. Dkt. 39 at 4; Dkt. 44 at 27. Both parties agree that Virginia law applies to this claim. *Id.* It is well-settled that, in Virginia, the elements of a tortious

---

[25] To the extent that Plaintiffs' diversity jurisdiction argument separately constitutes a request to dismiss this case pursuant to Federal Rule of Civil Procedure 41(a), the Court denies the request. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 323 F.R.D. 232, 235 (E.D. Va. 2017) (recognizing that "the Fourth Circuit has found 'on multiple occasions that a district court does not abuse its discretion in denying a motion for voluntary dismissal if the case has advanced to the summary judgment stage and the parties have incurred substantial costs in discovery'" (internal citations omitted)).

interference with contract claim are: (i) the existence of a valid contractual relationship or business expectancy; (ii) knowledge of the relationship or expectancy on the part of the interferor; (iii) intentional interference inducing or causing the breach or termination of the relationship or expectancy; and (iv) resultant damage to the party whose relationship or expectancy has been disrupted. *Ass'n for Supervision & Curriculum Devel., Inc. v. Int'l Council for Educ. Reform & Devel., Inc., et al.*, 2011 WL 1225750, at \*9 (E.D. Va. Mar. 14, 2011) (citing *Century-21 v. Elder*, 239 Va. 637 (1990)). Both parties acknowledge that only a party outside of the contractual relationship can interfere with a contract, but that an employee can intentionally interfere with a contract when he acts outside the scope of his agency or employment. *See* Dkt. 48 at 10 (citing *Chaves v. Johnson*, 230 Va. 112, 120 (1985)); Dkt. 39 at 4 (citing *Francis Hosp., Inc. v. Read Props., LLC*, 296 Va. 358, 363 (2018)).

Essentially, Westlake argues that Tsupko was not acting as an agent of Victory Motors and therefore is liable for interfering with the repayment of the loan funds as required by the PNLSA. This Court disagrees, as Tsupko was not a stranger to the contract (here, the PNLSA). In the first instance, Tsupko *signed* the PNLSA. Dkt. 1-3 at 18. Moreover, it is undisputed and affirmatively alleged by Westlake, that Tsupko was the guarantor of the PNLSA, which guaranty is itself *part of the PNSLA*. Dkt. 1-3 at 29 ("Individual and Personal Guaranty" is Exhibit C to the PNLSA). The PNSLA provides that, as Guarantor, there are certain provisions of the PNLSA that apply to Tsupko in his capacity as Guarantor. *See, e.g.*, Dkt. 1-3 at 6 ("That Borrower and all Guarantors are legally competent . . . ."); *id.* at 9 ("Borrower and each Guarantor authorize Lender to obtain and share credit information . . . ."); *id.* ("Borrower and each Guarantor authorize Lender to review Borrower's account periodically . . . ."); *id.* at 10 ("Borrower and Guarantors understand that Lender may, at any time and without notice to Borrower, with or without cause, demand this Note

19

immediately be paid in full."). Thus, based on a review of the PNLSA, Tsupko was not a stranger to the PNSLA and cannot be liable for tortious interference with the PNLSA. *See France Hosp., Inc.*, 296 Va. at 363 ("[W]e have made clear that only a party *outside* the contractual relationship with the plaintiff is subject to liability as an interferor." (emphasis in original)). Accordingly, Plaintiffs are entitled to summary judgment on Westlake's tortious interference counterclaim.

Even assuming *arguendo* that Tsupko had not signed a portion of the contract in his individual capacity as Guarantor, the Court would still find that there is not adequate evidence in the summary judgment record to establish that Tsupko was acting outside the scope of his agency relationship. *See Fox v. Deese*, 234 Va. 412, 427 (1987) (holding that an employee could only be held liable for tortious interference where "he was acting outside the scope of his employment"). Here, the summary judgment record, as set forth by Westlake, does not establish that Tsupko was acting outside of his agency relationship. *See* Dkt. 44 at 11 ¶ 26 ("*Victory Motors* sold the Subject Vehicles" (emphasis added)); *id.* ¶ 27 (asserting scheme allowed "*Victory Motors* to sell vehicles for which Westlake held the titles" (emphasis added)); *id.* at 12 ¶ 28 ("Tsupko, *Victory Motors, or its employees* had each customer complete an Application for Certificate of Title and Registration" (emphasis added)); Dkt. 48 at 4 ¶ 9 ("*Victory Motors* concealed the sales at issue from Westlake" (emphasis added)); *id.* at 5 ¶ 10 ("*Victory Motors* did hide the location and status of the vehicles from Westlake" (emphasis added)). Thus, Westlake's argument here is contradicted by its own assertions of undisputed fact and responses to Plaintiffs' assertions of undisputed fact which establish that, in Westlake's view, any actions taken by Tsupko were taken on behalf of Victory Motors. Because Westlake has itself asserted that Tsupko's actions were actually Victory Motors' actions, Westlake cannot demonstrate that there "was a complete stepping aside from the employer's business." *Kensington Assocs. v. West*, 234 Va. 430, 434 (1987). Although Westlake's

20

citations to evidence in the record regarding spending from Victory Motors' bank accounts might suggest that Victory Motors and Tsupko were not observing corporate formalities (Dkt. 48 at 11), they have little materiality to the tortious interference claim, which is based on the procurement of duplicate titles and selling of the Subject Vehicles. *See* Dkt. 44 at 29 (arguing that Westlake is entitled to summary judgment because "Tsupko had knowledge" of the contract and "interfered by fraudulently obtaining duplicate titles to sell the Subject Vehicles and retain funds to Westlake's detriment"). Thus, because Westlake has not established that Tsupko was acting outside of his agency relationship (and, indeed, affirmatively alleges that Tsupko's acts were Victory Motors' acts), Westlake cannot establish that Tsupko was a stranger to the contract as necessary to succeed on a tortious interference claim against him.

In short, whether the Court looks strictly at the PNLSA or whether the Court looks at the acts of Tsupko as set forth by Westlake, the evidence in the record establishes that Tsupko was not "a party *outside* the contractual relationship." *France Hosp., Inc.*, 296 Va. at 363 (emphasis in original). Thus, Westlake's Motion will be denied and Plaintiffs' Motion granted in this regard.

C.      Westlake's Replevin Counterclaim

In Plaintiffs' Motion, Plaintiffs sought summary judgment on Westlake's replevin counterclaim. Dkt. 39 at 7. Although Westlake's Motion sought summary judgment in its favor on all of its counterclaims, Dkt. 40, the Memorandum in Support fails to address the replevin counterclaim at all, Dkt. 44. In Westlake's Opposition, Westlake asserts that its replevin counterclaim should be dismissed without prejudice. Dkt. 48 at 12. Plaintiffs argue, without citation, that the replevin counterclaim should be dismissed with prejudice. Dkt. 54 at 2.

For largely the same reasons that Westlake argues that the entire Complaint should not be dismissed to the extent that the diversity jurisdiction could be construed as a Rule 41 motion,

Westlake's own request to dismiss without prejudice will be denied. *See* Dkt. 55 at 6; *Steves & Sons, Inc.*, 323 F.R.D. at 235 (recognizing that "the Fourth Circuit has found 'on multiple occasions that a district court does not abuse its discretion in denying a motion for voluntary dismissal if the case has advanced to the summary judgment stage and the parties have incurred substantial costs in discovery'" (internal citations omitted)).   Courts considering voluntary dismissals consider: (i) the opposing party's effort and expense; (ii) excessive delay or lack of diligence; (iii) insufficient explanation of the need for dismissal; and (iv) the present state of the litigation, *i.e.*, whether a motion for summary judgment is pending. *Teck Gen. P'Ship v. Crown Cent. Petroleum Corp.*, 28 F. Supp. 2d 989, 991 (E.D. Va. 1998).

Here, Westlake itself explains all of the discovery that the parties engaged in and noted the expenses that such discovery created. Dkt. 55 at 6-7. Those apply equally to Plaintiffs. Moreover, Westlake knew, as of October 2024, that it would seek dismissal of its replevin counterclaim. Dkt. 48 at 12 (documenting Westlake's request that Plaintiffs stipulate to the dismissal of Westlake's replevin counterclaim). Plaintiffs denied Westlake's request to stipulate to dismissal. *Id.* And, instead of immediately moving this Court to voluntarily dismiss the replevin claim, Westlake waited until its Opposition to Plaintiffs' Motion to raise the issue (Dkt. 48 at 11-12) and, indeed, in its own Motion, Westlake sought "judgment in favor of Westlake on all of . . . Westlake's counterclaims" without recognition of its intent to dismiss the replevin counterclaim (Dkt. 40). Westlake was therefore not diligent in pursuing dismissal and put Plaintiffs through the time, burden, and expense of briefing an issue that Westlake did not intend to argue. This delay is inexcusable, especially where Westlake purported to affirmatively seek judgment in its favor on the replevin claim.

Westlake's explanation for dismissal also counsels in favor of denying dismissal without prejudice, because Westlake has essentially conceded that, even after discovery, it cannot prove its replevin claim. Dkt. 48 at 12 (asserting that dismissal is sought in light of Plaintiff's testimony that Victory Motors is not in possession of the Subject Vehicles). Westlake argues that its request should be granted because it offered to stipulate to dismissal but could not "reach common ground." *Id.* But Westlake does not explain why this counsels in favor of dismissal without prejudice rather than with prejudice, where Westlake never took the next logical step of bringing the matter to the Court. Westlake's explanation for dismissal without prejudice is essentially that this Court should grant to Westlake what Plaintiffs would not agree to, because Plaintiffs would not agree to it, notwithstanding their failure to bring the matter to the Court's attention and forcing Plaintiffs to brief the issue. This the Court will not do.

Finally, the state of the litigation is that discovery has closed, and Westlake waited until *after* motions for summary judgment were filed to raise this issue. This Court finds, as Westlake suggested with respect to Plaintiffs, that Westlake's voluntary dismissal argument is "nothing more than an eleventh-hour attempt to avoid an adverse ruling." Dkt. 55 at 7. Thus, the request for voluntary dismissal without prejudice will be denied.

Turning to the substance of the replevin counterclaim, because Westlake has failed to address the merits of the arguments raised by Plaintiffs, Westlake has conceded its replevin claim and summary judgment in favor of Plaintiffs is appropriate. *See Butler v. United States*, 2022 WL 5239520, at *1 (E.D.N.C. Aug. 3, 2022) ("If the moving party files a motion for summary judgment based on a legal theory in plaintiffs [sic] complaint and the opposing party fails 'to address the arguments presented by the moving party and therefore appears to concede that summary judgment is appropriate. Failure to address arguments made in favor of summary

23

judgment amounts to 'an outright failure to join in the adversarial process and ordinarily results in waiver.'" (internal citations omitted)); *Amazon.com, Inc. v. WDC Holdings, LLC*, 2023 WL 2815140, at *11 (E.D. Va. Apr. 6, 2023) (finding where party "does not respond" to arguments that party "has conceded this point"). Accordingly, summary judgment in favor of Plaintiffs is appropriate based on Westlake's failure to substantively response to Plaintiffs' Motion on the replevin claim.

Even so, an examination of the merits also reveals that Plaintiffs are entitled to summary judgment. As with the tortious interference claim, this matter is governed by Virginia law because Virginia is the location of the tort. Dkt. 44 (Westlake acknowledging that "The Court Should Apply Virginia Law to Westlake's Tort Claim"); *see also Metro Mail Servs., Inc. v. Pitney Bowes, Inc.*, 2017 WL 1230848, at *5 (E.D. Va. Mar. 31, 2017) ("Virginia's choice of law rule in tort actions is *lex loci delicti*, meaning the law of the place of the wrong governs all matters related to the basis of the right of the action."). In Virginia, the legislature has abolished actions for replevin. Va. Code § 8.01-218. For that reason alone, Plaintiffs are entitled to summary judgement on Westlake's replevin counterclaim. In the alternative, assuming that the replevin claim could be construed as a claim for detinue, the Supreme Court of Virginia has recognized that the "gist of an action of detinue is the unlawful detainer of specific personal property" and the "sole inquiry is . . . whether the defendant wrongfully detains [the property]." *Talley v. Drumheller*, 135 Va. 186, 190 (1923). Here, Plaintiffs have adduced evidence that they do not have possession of the Subject Vehicles (Dkt. 39 at 3 ¶ 9). Accordingly, for all of these reasons, summary judgment in favor of Plaintiffs on the replevin counterclaim is appropriate.

\*       \*       \*

These three arguments dispose of Plaintiffs' Motion in its entirety. In sum, Plaintiffs' Motion will be denied with respect to its argument that this Court lacks subject matter jurisdiction, as this Court clearly has (and has always had) diversity jurisdiction. Plaintiffs' Motion will be granted with respect to Westlake's tortious interference and replevin counterclaims and judgment will be entered in favor of Plaintiffs on those counts. In granting Plaintiffs' Motion with respect to the tortious interference counterclaim, the Court also denies Westlake's Motion on the same counterclaim. The remaining arguments addressed by the Court are those raised in Westlake's Motion.

### D.    Plaintiffs' Breach of Contract Claims

The claims in Plaintiffs' Complaint are difficult to decipher, because the Complaint was originally filed *pro se* and, after Plaintiffs obtained counsel, counsel never amended the Complaint to clarify Plaintiffs' claims. Dkt. 1. Westlake reasonably construes Plaintiffs' Complaint as arguing that there was a breach of contract premised on improper repossession, acceleration of amounts due, and unauthorized charges. Dkt. 44 at 18. Plaintiffs do not contest this construction of their Complaint. *See generally* Dkt. 49. With respect to what law should apply to the breach of contract claims, the parties agree that any breach of contract claims are governed by California law. *See* Dkt. 44 at 27; Dkt. 49 at 19.

Plaintiffs' only argument in opposition to Westlake's Motion is that the Complaint should be dismissed for lack of subject matter jurisdiction. As discussed *supra*, that argument fails, as diversity jurisdiction has always existed here (regardless of whether Plaintiffs, when they were *pro se*, made adequate affirmative allegations to support such jurisdiction). Other than the unpersuasive argument regarding lack of diversity jurisdiction, Plaintiffs fail to substantively address their own claims and Westlake's Motion seeking summary judgment with respect to those

25

claims. Again, district judges within this District recognize that, where a party fails to respond to an argument, it is "effectively conceding" the argument. *Intercarrier Commc'ns, LLC v. Kik Interactive, Inc.*, 2013 WL 4061259, at *1 (E.D. Va. Aug. 9, 2013); *Amazon.com, Inc.*, 2023 WL 2815140, at *11 (same); *Orbit Corp. v. Fedex Ground Package Sys., Inc.*, 2016 WL 6609184, at *15 (E.D. Va. Nov. 8, 2016) (collecting cases and noting that "many courts within the Fourth Circuit, as well as other circuits, have held that a plaintiff's failure to respond to a summary judgment motion constitutes waiver or abandonment of a claim"). Accordingly, summary judgment is appropriately granted in favor of Westlake on Plaintiffs' Complaint.

In any event, under California law, the elements of a breach of contract claim are: (i) the existence of a contract; (ii) plaintiff's performance or excuse for nonperformance; (iii) defendant's breach; and (iv) damages. *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). Here, there is a contract: the PNLSA. Dkt. 49 at 19 (Plaintiffs referring to the PNSLA as "the parties' contract"). But Plaintiffs have not suggested how Westlake breached, because, under the terms of the PNLSA, Westlake is permitted to "demand, collect, receipt for, settle, compromise, sue for repossess, accept surrender of, foreclose, or realize upon any Collateral." Dkt. 1-3 at 26 ¶ 3(a). Under the terms of the PNLSA, Westlake is also permitted to "[d]emand immediate payment of all Liabilities" and to revoke or limit access to the portal at any time. *Id.* at 6 ¶ 3(q); *id.* at 12 ¶ 6(a). Finally, Westlake is entitled to take control of funds to satisfy outstanding liabilities under the terms of the PNLSA. *Id.* at 12 ¶ 6(d). Thus, in addition to conceding the breach of contract claims by failing to respond, Plaintiffs have failed to create a genuine dispute of material fact as to whether Westlake breached. Because it is apparent on a review of the undisputed summary judgment record and a review of the PNLSA that Westlake did not breach the PNLSA, Westlake

26

is entitled to summary judgment on Plaintiffs' Complaint. Accordingly, Westlake's Motion will be granted in this regard.[26]

### E.    Westlake's Breach of Contract Claims

Westlake asserts two breach of contract counterclaims: first, a breach of the PNLSA against Victory Motors, and, second, a breach of the Guaranty against Tsupko. Dkt. 10 at 14-15. Again, the parties agree that California law applies to Westlake's breach of contract claims. *See* Dkt. 44 at 27; Dkt. 49 at 19. The parties also agree that the PNLSA and the Guarantee are valid enforceable contracts. Dkt. 1-3; Dkt. 49 at 1 ¶ 2 (not disputing the PNLSA); *id.* at 4 ¶ 11 (not disputing the Guaranty); *id.* at 20-23 (not disputing validity or enforceability of the PNLSA or the Guaranty).[27]

As discussed *supra*, the PNLSA required that Victory Motors repay the Liabilities and, if it failed to do so, the Guaranty required that Tsupko repay the Liabilities. Dkt. 1-3 at 7 ¶ 4(e) (requiring repayment); *id.* at 32 ¶ 4(b) (requiring Tsupko to make payment as Guarantor). Here, Plaintiffs have not disputed that Victory Motors has failed to make full payment to Westlake for the twenty-four Subject Vehicles which Victory Motors used Westlake funds to purchase and for which Westlake holds the original titles. Dkt. 44-1 at 10-11 ¶¶ 24-28; Dkt. 44 at 8 ¶ 21, 13 ¶ 35 (asserting that Victory Motors was delinquent with respect to the Subject Vehicles); Dkt. 49 at 6

---

[26] Westlake is also correct that, to the extent Tsupko sought to sue for breach of contract in his individual capacity, he lacked standing to do so. *See Tsupko v. NextGear Capital, Inc.*, No. 1:24-cv-00359-LMB-LRV, Order dated April 24, 2024 (E.D. Va.) (finding that Tsupko lacked standing to sue lender). Additionally, Tsupko cannot premise a claim on "threats and harassment." *Cummings v. Moore*, 2009 WL 222946, at *3 (E.D. Va. Jan. 26, 2009) ("Aside from Title VII, Plaintiff provides, and this Court finds, no authority supporting the stand-alone harassment claim."). The Court does not construe the alleged "threats and harassment" as attempting to assert a claim of intentional infliction of emotional distress and, in any event, a review of the summary judgment record reveals that such a claim would fail. *See Adkins v. Whole Foods Mkt. Grp., Inc.*, 2016 WL 1367170, at *3 (E.D. Va. Apr. 5, 2016).

[27] By failing to respond to Westlake's argument that the PNLSA is a valid contract, Plaintiffs have conceded this point. *See Amazon.com, Inc.*, 2023 WL 2815140, at *11.

¶ 21, 11 ¶ 35 (admitting or failing to genuinely dispute Westlake's asserted facts as discussed *supra*). Indeed, Plaintiffs specifically conceded that Victory Motors was "delinquent." Dkt. 49 at 11 ¶ 35 (not disputing that "it was now delinquent"). With respect to the Guaranty, Tsupko breached the Guaranty when he failed to make full payment to Westlake to cover Victory Motors' delinquencies after being informed of such delinquencies on February 26, 2024. Dkt. 44 at 7 ¶ 39; Dkt. 44-16 (informing Tsupko of delinquency and demanding payment); Dkt. 49 at 11 ¶ 39 (not disputing Westlake's assertion). Although Plaintiffs dispute the total amount owed, Plaintiffs do not dispute that some amounts were owed. Dkt. 49-1 at 4-5. Thus under California law and on this summary judgment record, there is no genuine issue of material fact that Victory Motors and Tsupko breached their respective contracts with Westlake and are liable to Westlake for breach of contract.

Seeking to avoid this conclusion, Plaintiffs argue waiver. Dkt. 49 at 21. Essentially, Plaintiffs argue that the parties had engaged in a course of conduct and that "Victory Motors would commonly obtain Dealer Title Only ('DTO') titles from the DMV for the purpose of ensuring that customer's [sic] vehicles were registered in compliance with state regulations." *Id.* But Plaintiffs offer no explanation why such course of dealings would relieve Plaintiffs of their obligation to ever repay the funds borrowed to Westlake. And, indeed, such argument stands in contrast to their concession that they were delinquent. Dkt. 49 at 11 ¶ 35 (not disputing that "it was now delinquent"). To establish waiver, Plaintiffs would have to demonstrate that Westlake intended to waive its right *to repayment*. *See Park v. NMSI, Inc.*, 96 Cal. App. 5th 346, 357-58 (Cal. App. Oct. 12, 2023) ("The pivotal issue in a claim of waiver is the intention of the party who allegedly relinquished the known legal right." (internal citations and alterations omitted)). Here, Plaintiffs have adduced no competent evidence at summary judgment that, even assuming that Westlake

intended to permit Plaintiffs to obtain the DTO titles, that it intended to waive its right to ever receive repayment of the loan funds. Accordingly, at summary judgment, Plaintiffs have failed to support their waiver argument with competent evidence sufficient to create a genuine issue of material fact and summary judgment in favor of Westlake remains appropriate.[28]

Plaintiffs second argument does not apply liability, but to damages. Dkt. 49 at 21-23. Plaintiffs argue that Westlake has not done enough to establish, at summary judgment, the specific amount of damages owed for the breaches of contracts. *Id.* With respect to whether Plaintiffs have established a genuine issue of material fact as to damages, the Court agrees with Plaintiffs that the Court cannot discern for purposes of summary judgment that Westlake has appropriately credited the funds that already paid. Although Westlake has produced the payment history, the Court lacks sufficient explanation from a witness to understand what the payments in that document mean and reflect. Dkt. 44-2 at 21-38. Additionally, the Court finds that there is insufficient discussion in the parties' briefs for the Court to have an understanding of what payments should and should not be credited. Indeed, in its Reply, Westlake suggests for the first time that the actual balance is $430,941.47. Dkt. 55 at 16. Thus, at this point, Plaintiffs have supported a material dispute as to whether certain funds have been appropriately credited to their account. This does not, however, preclude the grant of summary judgment as to liability to

---

[28] In any event, waiver is an affirmative defense that must be set forth in a responsive pleading. Fed. R. Civ. P. 8(c)(1). A failure to appropriately raise an affirmative defense results in the loss of that defense. *See RCSH Operations, L.L.C. v. Third Crystal Park Assocs. L.P.*, 115 F. App'x 621, 629–30 (4th Cir. 2004) ("It is settled that a failure to raise an affirmative defense in the appropriate pleadings results in the loss of that defense . . . ."). Here, Plaintiffs did not raise waiver as an affirmative defense in their Answer. Dkt. 18. Westlake further asserts that Plaintiffs failed to raise the issue of waiver during discovery and that Westlake "was unable to explore the basis for Plaintiffs' theory or gather evidence to rebut the waiver theory." Dkt. 55 at 12. Thus, the failure to plead the waiver theory prejudiced Westlake and the waiver theory is itself waived. Accordingly, this argument also fails for this independent reason.

Westlake, leaving open the issue of damages. *See GemCap Lending I, LLC v. Mann*, 2020 WL 5934290, at *7 (C.D. Cal. Jul. 31, 2020) ("A court may render an interlocutory summary judgment on the issue of contract liability, even where a genuine issue exists as to the amount of damages."); *Nenr Invs., LLC., v. Starbucks Corp.*, 2009 WL 1404732, at *9 (W.D. Va. May 18, 2009) ("While the undersigned finds that a dispute exists as to the amount of damages recoverable, this does not prevent entry of partial summary judgment in the plaintiff's favor as to liability and the types of damages recoverable, if proven."). Accordingly, the Court will grant in part and deny in part (without prejudice) Westlake's Motion with respect to the breach of contract counterclaims.

## V.    CONCLUSION

In sum, the Court has (and has always had) subject-matter jurisdiction, in the form of diversity jurisdiction, to consider the pending motions for summary judgment. With respect to Plaintiffs' Motion for Summary Judgment, the Court denies the Motion to the extent it seeks to dismiss the entire case for lack of diversity jurisdiction. On the other hand, the Court grants Plaintiffs' Motion with respect to Westlake's tortious interference and replevin counterclaims. With respect to Westlake's Motion for Summary Judgment, the Court grants the Motion to the extent that Westlake has established liability with respect to its breach of contract claims. The Court denies the Motion to the extent Westlake seeks a determination of damages, summary judgment in its favor with respect to the tortious interference claim, or dismissal without prejudice of the replevin claim.

Accordingly, it is hereby ORDERED that Plaintiffs' Motion for Summary Judgment (Dkt. 38) is GRANTED-IN-PART and DENIED-IN-PART; and it is

FURTHER ORDERED that, at the appropriate time, the Clerk is DIRECTED to enter Rule 58 judgment in favor of Plaintiffs and against Defendant on Defendant's Counts III and IV of the Counterclaim (Dkt. 10); and it is

FURTHER ORDERED that Defendant's Motion for Summary Judgment (Dkt. 40) is GRANTED-IN-PART and DENIED-IN-PART; and it is

FURTHER ORDERED that, at the appropriate time, the Clerk of the Court is DIRECTED to enter Rule 58 judgment on behalf of Defendant and against Plaintiffs on all Counts of the Complaint (Dkt. 1); and it is

FURTHER ORDERED that the Court finds in favor of Defendant as to liability on Counts I and II of the Counterclaim (Dkt. 10); and it is

FURTHER ORDERED that, within THIRTY (30) DAYS of the issuance of this Memorandum Opinion and Order, the parties are DIRECTED to contact the chambers of U.S. Magistrate Judge Lindsey R. Vaala to schedule a settlement conference; and it is

FURTHER ORDERED that, within FOURTEEN (14) DAYS of the settlement conference with Judge Vaala, Defendant Westlake is DIRECTED to submit a Notice to the Court indicating whether: (i) the parties have settled the case; (ii) Defendant Westlake intends to renew its motion for summary judgment solely with respect to the issues of damages as to Counts 1 and 2 of the Counterclaim;[29] or (iii) the parties require a final pretrial conference to schedule a trial with respect to the issue of damages as to Counts 1 and 2 of the Counterclaim; and it is

---

[29] If Defendant Westlake intends to renew its motion for summary judgment solely with respect to the issue of damages, both parties are instructed to provide sufficient information to the Court in the form of documentary evidence, declarations and affidavits, or deposition transcripts so that the Court can understand what payments Victory Motors made, what payments should be attributed to its delinquency, and, ultimately, how much Victory Motors owes. The parties are further instructed to provide a basis, whether based on the PNLSA or case law, regarding each category of damages and why it should or should not be awarded here.

FURTHER ORDERED that the Clerk of the Court is DIRECTED to STAY this case and place it among the inactive causes until Defendant Westlake has filed its Notice regarding how the case will proceed after the parties have conducted their settlement conference with Judge Vaala.

IT IS SO ORDERED.

Alexandria, Virginia
August *13*, 2025

/s/
_____
Rossie D. Alston, Jr.
United States District Judge